| | | |
|---|---|---|
| LEVEL 3 COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consolidated Case |
| v. | ) | No. 4:04-CV-871 CAS |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Associated Case |
| v. | ) | No. 4:04-CV-1046 CAS |
| | ) | |
| LEVEL 3 COMMUNICATIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Level 3 Communications, LLC ("Level 3") filed suit against the City of St. Louis ("City") seeking a declaration that the terms, restrictions, obligations and fees established by the Communications Transmission System License Agreement ("License Agreement") between Level 3 and the City violates the Federal Telecommunications Act of 1996, ("FTA" or "Act"), 47 U.S.C. § 253, 42 U.S.C. § 1983, and state law. The City then filed a declaratory judgment action against Level 3 asserting that the compensation provisions of the License Agreement are valid and binding under state and City law, and that Level 3 must comply with that provision as long as it occupies the City's rights-of-ways.

The Court consolidated the cases into the above-styled case, and the matter is now before the Court on cross-motions for summary judgment. The motions are fully briefed. The Court will grant the motions in part and deny the motions in part for the reasons set forth below.

## I.	BACKGROUND

On March 8, 1991, the City enacted Chapter 23.64 ("chapter 23.64" or "Ordinance") for the purpose of regulating the process and procedures by which an entity seeking to construct, operate, use, replace, reconstruct or maintain telecommunications facilities that would occupy the streets, public ways and/or public places within the City. Chapter 23.64 requires all such entities to enter into a license agreement with the City of St. Louis Board of Public Service ("BPS"), and that such licenses expressly incorporate the requirements of Chapter 23.64 by reference. See 23.64.040. On April 13, 1999, Level 3 entered into the License Agreement with the City. The License Agreement contains several compensation provisions. The License Agreement incorporates by reference the terms of Chapter 23.64.

Chapter 23.64 requires in pertinent part:

A.	The licensee shall submit an application for licensure to include, the name, address and telephone number of the applicant; the legal status of the applicant; the name address and telephone number of a responsible person whom the city may notify or contact at any time concerning the communications transmission system; an engineering site plan showing the proposed location of the communications transmission system, including any manholes or overhead poles, the size, type and proposed depth of any conduit or other enclosures, and the relationship of the system to all existing streets, sidewalks, poles, utilities, and other improvements within the public streets; minimal technical standards which the licensee proposes to follow in construction of the licensed system; diameter and projected length of the communication aerial or conduit; and any additional information which the Agency may require, subject to the approval of the Board of Public Service, see, 23.64.050 (A) - (B);

B.	The licensee shall submit an application to amend the license whenever any licensee wishes to expand its facilities, see, 23.64.050 (D);

C.      The licensee shall obtain any permits required to execute such construction required under City ordinances or regulations issued by any of the City's agencies or departments.

D.      The license agreement shall specify that the Licensee shall provide and install in a common trench with the conduit of the Licensee a municipal service conduit(s) if requested and specified by the Board of Public Service, see, 23.64.80 (G);

....

The Agency shall reduce subsequent license charges due under the license by an amount equal to the additional charge of the Licensee of the conduit, pull boxes, vaults, other materials and additional construction work, other than the cost of the trenching itself, incurred as a result of construction of the municipal service conduit, see, 23.64.80 (G);

E.       To maintain a performance bond for the benefit of the City, see, 23.64.120 (A);

F.      To obtain and maintain a liability insurance policy of at least $500,000 per incident with the city named as an additional insured party, see, 23.64.130 (C);

G.      To indemnify the City for all claims, including damages caused by or arising out of any act or negligent omission of the City or its agents, "arising out of or in any way connected with the installation use, operation, maintenance or condition of the Licensee's communications transmission system," see, 23.64.130 (B);

H.      To use only contractors who have been licensed by the City in constructing, installing, or maintaining private network facilities installed under the license, see 23.64.140 (D);

I.      The Licensee keep accurate, complete and current maps and records of its system and facilities which occupy the streets, public ways and public places within the City and shall furnish as soon as they are available three (3) complete copies of such maps and records to the agency, see 23.150 (I);

J.      A license issued pursuant hereto shall not be transferred without the prior written authorization of the Board of Public Service, see 23.64.170.

In addition, the Ordinance allows the City:

A.      To revoke a license and cancel the underlying license agreement if the licensee violates the terms of that agreement or this chapter, see, 23.64.080 (C);

B.      To establish minimum technical standards and specifications which licensees must adhere to in installing their network facilities, 23.64.140(A).

In addition to the above terms and requirements, chapter 23.64 establishes an annual license fee that Level 3 must pay to the City. The license charge is calculated on the basis of the number of linear feet of conduit installed within the City, and the number of conduits within each linear-foot that carry live (activated) fiber optic cable. In the first year of the License Agreement, Level 3 paid license charges that ranged from $1.72 to $3.45 per linear foot, depending on the number of Level 3's conduits that were in use. Each year the license charges are recalculated based on the amount of Level 3's conduit in use and are automatically adjusted by the cost of inflation, as measured by the Consumer Price Index. The fee varies depending on the type of installation--aboveground or underground--and the diameter of the installed conduit. See 23.64.090.

In addition to the conditions imposed by Chapter 23.64, which are incorporated into the License Agreement by reference, the License Agreement provides:

A.      Level 3's system shall be used as a "competitive access provider" telecommunications system only, see, ¶ 2(B);

B.      Level 3 shall obtain separate permits or authorizations required under any City ordinance or regulation for the construction, installation, operation, maintenance or use of its network facilities, see, ¶ 7(A);

C.      Level 3 must provide and maintain a performance bond of $100,000 throughout construction and installation of its network facilities, conditioned on Level 3's faithful performance of all obligations under the License Agreement. Following construction and/or installation, Level 3 must provide and maintain a performance bond in the amount of $25,000, conditioned on Level 3's faithful performance of all obligations under the License Agreement. Such bonds to be solely for the benefit of the City and in a form approved by the City Counselor, see, ¶ 9 (A);

D.      Level 3 must maintain, during the term of the License Agreement, continuous uninterrupted general insurance under a policy or policies which provide coverage on all facilities installed, constructed, maintained, operated or used by or on behalf of Level 3 and on all of the activities of Level 3 and its employees or contractors within the geographic area covered by the License Agreement. Such policy or policies must provide no less than $1,000,000 per person and $1,000,000 per incident personal injury liability coverage and

4

$1,000,000 property damage liability coverage, and must name the City as an additional insured party, see, ¶ 8 (D);

E.      Level 3 must provide the City with copies of all tariffs or other documents filed with the Missouri Public Service Commission or the Federal Communications Commission which pertain to the City of St. Louis or the License Agreement, and any other documents that the City might request, see, ¶ 12;

F.      Level 3 obtain prior written consent of the City before any assignment or transfer of ownership in the License Agreement unless Level 3 remains solely responsible for installing, maintaining, replacing and removing all facilities in the Project, see, ¶ 13.

On or about July 28, 2003, Level 3 stopped paying the fees due under the License Agreement and stated that it would not pay the future fees required under the License Agreement.

The City claims the Level 3 owes it damages through and including the date of the Agreement, the period from July 1, 2003 through June 30, 2004, plus penalty and interest charges which continue to accrue.

In support of its motion for summary judgment, Level 3 argues the City has impermissibly impaired the ability of telecommunications companies, like itself, to provide interstate and intrastate telecommunications services. Level 3 argues the burdens imposed by the City, including an excessive non-cost based fee for access to the public rights of way, far exceed the City's narrowly limited authority under state and federal law to regulate telecommunications companies such as Level 3. Level 3 insists the City's ordinance here is identical to the ordinance struck down in XO Missouri v. City of Maryland Heights, 256 F. Supp.2d 987, 999 (E.D. Mo. 2003), which Chief Judge Carol Jackson of this district found to be onerous.

The City argues that Level 3 fails to show that any of the provisions of Chapter 23.64 or the License Agreement actually prohibit or have the effect of prohibiting Level 3 or anyone else from providing telecommunications services. The City further argues that the Ordinance does not contain

5

many of the onerous provisions contained in the Maryland Heights ordinance that Judge Jackson found to be prohibitory. Moreover, the City claims the linear foot fee it imposes is both fair and reasonable and is imposed on all similarly-situated entities on a competitively neutral and nondiscriminatory basis, and therefore must be upheld.

## II. DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and his entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c).

Once the moving party has met his burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Anderson, 477 U.S. at 257; City of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 273-74 (8th Cir. 1988). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Citrate,

477 U.S. 317, 322 (1986). Additionally, this Court is "'not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.'" White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (quoting InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)).

The Telecommunications Act was enacted to promote competition among, and reduce regulation of, telecommunications providers. 47 U.S.C. § 253; H.R.Rep. No. 104-458 (1996). See also Qwest Corp. v. Minnesota Public Utils. Comm., Nos. 04-3368 (8th Cir. Nov. 1, 2005) (FTA was intended to create competition between carriers in local telecommunications service markets which had been traditionally dominated by a single monopoly carrier). Toward that end, the FTA prohibits state and local governments from creating "barriers to entry," legal requirements that prohibit or have the effect of prohibiting a company from providing telecommunication service. 47 U.S.C. § 253.

Section 253 provides in relevant part:

 Removal of barriers to entry.

 (a) In general
No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on

a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Section 253(a) preempts regulations that not only prohibit outright the ability of any entity to provide telecommunications services, but also those that "may ... have the effect of prohibiting the provision of such services." 47 U.S.C. § 253(a). Thus, while § 253 begins with a broad prohibition against state and local regulation, it then enumerates certain narrow exceptions to the broad prohibition, thus leaving a "safe harbor" for limited local regulations.

### A.    The Ordinance as a Whole

To determine whether preemption exists under § 253(a), it is necessary to analyze whether the City's regulatory scheme "in combination" has "the effect of prohibiting the provision of telecommunications services." City of Auburn v. Qwest, 260 F.3d 1160, 1176 (9th Cir. 2001). For example, the Court may considers such factors as the nature of the application process, the requirements to obtain a franchise, the threat of penalties for failure to obtain a franchise, and the discretion the city reserves to grant, deny, or revoke a franchise. Id. "And, the ultimate cudgel is that each city reserves discretion to grant, deny, or revoke the franchises and the Cities may revoke the franchise if the terms in the ordinance are not followed ...". Id.

When evaluating an ordinance in the context of § 253, the first inquiry is whether the challenged ordinance "prohibit[s] or [has] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." XO Missouri v. City of Maryland Heights, 256 F.Supp.3d, 987, 991 (E.D. Mo. 2003). "Even if local requirements do not expressly prohibit a telecommunications service, the requirements might be so burdensome that they effectively achieve

the same result." Id., quoting Qwest Corporation v. City of Portland, 200 F.Supp.2d 1250, 1255 (D. Or. 2002).

The Ordinance here requires providers of telecommunications services to complete a one-page application for licensure. The Ordinance further requires compliance with the Department of Streets' normal permitting process. It also requires a provider to submit an application to amend its license whenever it wishes to expand its facilities. It also requires a provider to install and maintain conduit for the use and benefit of the City if requested and to bear entrenching costs associated with construction of the conduit and associated facilities installed for the City's exclusive use. The ordinance also requires a provider to maintain a performance bond for the benefit of the City, to obtain and maintain a liability insurance, and to indemnify the City for claims arising out of or in any way connected with the Licensee's communications transmission system. The Ordinance also permits a provider to use only licensed City contractors in constructing, installing, or maintaining private network facilities. In addition, under the Ordinance the City may revoke a license and cancel the underlying license agreement if the licensee violates the terms of that agreement or chapter 23.64. The City may also establish minimum technical standards and specifications which licensees must adhere to in installing their network facilities.

In light of the above, the Court believes the ordinance includes several provisions that "in combination" "have the effect of prohibiting" the ability to provide telecommunications services under 47 U.S.C. § 253(a).

B.    Specific Provisions

Although the Court concludes that the Ordinance as a whole violates § 253(a), the Court must next determine whether provisions of the Ordinance are saved by the safe harbor provisions of §§

253(b) and (c).  This determination is required because applying these provisions to the Ordinance as a whole without considering individual provisions could result in an improper infringement of the City's legitimate interests in regulating the uses of the public rights-of-way.  <u>TCG New York, Inc., v. City of White Plains</u>, 305 F.3d 67, 76 (2d Cir. 2002).  On the other hand, applying § 253(a) to individual provisions without considering the Ordinance as a whole would neglect the possibility that a town could effectively prohibit telecommunications services through a combination of individually non-objectionable provisions.  <u>Id.</u>

Pursuant to § 253(c), municipalities may "require fair and reasonable compensation from telecommunications providers ... for use of public rights-of-way" and the fees must be applied "in a nondiscriminatory manner."  Thus, the question is whether the gross revenue fee and the per lineal foot fee are fair and reasonable compensation.

Level 3 argues the fees imposed by the City cannot be saved by § 253(c) because the City has admitted that its fees are not based on its costs.  Level 3 contends the City has no idea what its actual costs are, nor has it ever attempted to quantify them.  Level 3 argues that even if the City could cite to evidence of its costs, the structure of the fees demonstrates that the fees cannot be cost-based.  Level 3 notes that one of that elements of "costs" is the administrative costs the City incurs fielding requests for permits and regulating the permitted construction.  At the same time, it argues all of those logistical tasks are handled by the Department of Streets, to which Level 3 or its contractors already pays fees when obtaining excavation permits.  Level 3 also argues the Communications Division collects fees equal to 100% of its operating costs directly from the Cable Television franchise in the City, while the per-foot fees that Level 3 pays are deposited into the City's general fund where they are used to pay for all of the various services provided by the City, including parks, schools, etc.

Level 3 further maintains that the Ordinance that establishes the fees purports to require that Level 3 leave the rights of way in "as good a condition as before the work." Level 3 complains it is also required to immediately repair any damage to streets and surrounding property at its own cost and "to the satisfaction of the City" and that whenever Level 3's network is in the way of a City project, it is Level 3's obligation to relocate the network at its own expense. Level 3 argues that since it must directly pay for any present or future damage it causes to the rights-of-way, the additional per-foot fees cannot be directed towards any physical cost incurred by the City.

Level 3 also claims the fees are illegal because when the State of Missouri decided to take over fiscal responsibility for maintaining certain streets in the City, the City did not consider lowering or waiving Level 3's access fees for those streets, rather the Communications Division campaigned to protect its ability to collect these fees, despite the expected reduction in actual costs. Level 3 maintains that the City never formally notified Level 3 that the streets it occupies had been taken over by the State and that the City was hoping to charge Level 3 as much as $90,257.17 for occupying streets that the City would not have to maintain. Thus, Level 3 contends that fees charged for access to roads that are no longer even within the City's technical jurisdiction cannot be "fair and reasonable" under the safe harbor provision of § 253(c).

The City counters that compensation under § 253 (c) is not limited to "costs." The City argues it can charge a reasonable rent that is not limited to costs, therefore any discussion of the City's costs is irrelevant. As to the State of Missouri's purported takeover of certain City streets, the City denies the State has taken over any City streets, nor have any streets been removed from the City's technical jurisdiction.

This Court agrees with Judge Jackson's reasoning in <u>XO Missouri v. City of Maryland Heights</u>, 256 F. Supp.2d 987, 999 (E.D. Mo. 2003), as well as other cases she cites, that revenue-based fees are impermissible under the FTA. Therefore, in order to meet the definition of "fair and reasonable compensation" the fee charged by the City must be directly related to the actual costs incurred by the City when a telecommunications provider makes use of the rights-of-way. As Judge Jackson noted, the legislative history of the FTA, as outlined in <u>Bell Atlantic-Maryland</u>, 49 F.Supp.2d at 817 n. 26, as well as the de-regulation concept in the FTA as a whole, supports this conclusion. As Judge Jackson further noted, "plainly a fee that does more than make a municipality whole is not compensatory in the literal sense, and instead risks becoming an economic barrier to entry." <u>XO Missouri</u>, 256 F.Supp.2d at 994, citing <u>Reno v. ACLU</u>, 521 U.S. 844 (1997) (stating that the FTA's primary purpose was to reduce regulation and encourage the rapid deployment of new telecommunications technologies).

Judge Jackson further explained:

> The legislative history of the FTA reveals that Congress expressly rejected a parity provision that would have required a single fee to be imposed on all carriers in a given area, because a parity requirement would ignore the different amounts of city rights-of-way each carrier used to provide its services. <u>See</u> <u>Bell Atlantic-Maryland</u>, 49 F.Supp.2d at 817 n. 26. Furthermore, in the only Congressional floor argument to address the cost provisions of the FTA, Senator Diane Feinstein explained that telecommunications companies should only be required to pay their share of fees to enable local governments to recover the increased street repair and paving costs that result from repeated excavations of the rights-of-way. <u>See</u> <u>In re Classic Telephone, Inc.</u>, 11 F.C.C.R. 13,082 (F.C.C.1996) citing 141 Cong.Rec. S8172 (daily ed. June 12, 1995), quoted in <u>TCG New York, Inc. v. City of White Plains</u>, 125 F.Supp.2d 81, 90 (S.D.N.Y.2000). Thus, there is support for the holding that any type of revenue-based fee is invalid under the FTA and any "fair and reasonable compensation" charged by a municipality must be directly related to the actual costs incurred by a municipality when a telecommunications provider makes use of the rights-of-way.

<u>XO Missouri</u>, 256 F.Supp.2d at 994.

Under § 253(c) of the FTA, the City must bears the burden of proving that the fees it seeks are both fair and reasonable. The Court finds that the City in this case has not made such a showing as the City has not offered evidentiary support that the fees at issue here have any relation to the City's costs in managing, inspecting, and maintaining its rights-of-way. Thus, for the reasons discussed above, the Court finds that the plaintiffs have established that the City's fees are not related to any cost-study or actual costs of the City of St. Louis in maintaining its rights-of-way. Thus, the City's fees are invalid under the FTA.

Level 3 also argues certain provisions of the ordinance are not legitimately related to the City's management of its public rights-of-way and are therefore invalid under § 253(c). Section 253 (c) allows a municipality to enact regulations that "manage the public rights-of-way." XO Missouri discussed the interpretation of "management of the public rights-of-way":

The FTA does not define "management of the public rights-of-way," but . . . a number of federal courts have relied on the FCC for interpretive assistance. The FCC has explained that right-of-way management means control over the right-of-way itself, not control over companies with facilities in the right-of-way:

> [S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of the streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable, (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way ... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

256 F.Supp.2d 987, 995 (internal quotations omitted).

Senator Diane Feinstein, during the floor debate on § 253(c), offered examples of the types of restrictions that the Congress intended to permit under § 253(c), including requirements that:

> 1) regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;
> 2) require a company to place its facilities underground rather than overhead, consistent with the requirements imposed on other utility companies;
> 3) require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;
> 4) enforce local zoning regulations;
> 5) require a company to indemnify the City against any claims of injury arising from the company's excavation.

See In re Classic Telephone, Inc., 11 F.C.C.R. 13,082 (F.C.C. 1996), citing 141 Cong. Rec. S8172 (daily ed. June 12, 1995), quoted in City of Auburn, 260 F.3d at 1177, 1178.  This Court will now apply the aforementioned guidelines to the specific provisions of the Ordinance at issue.

**License Agreement**

Level 3 challenges Chapter 23.64.040, arguing the City attempts to limit the types of services it can provide.  Chapter 23.64.040 provides that "no person shall construct, operate, use, replace, reconstruct or maintain a communications transmission system which occupies the streets, public ways and/or public places within the City unless such person has first entered into a license agreement with the Board of Public Service . . ."  As the record shows, a license is required under chapter 23.64 for all telecommunications systems other than those that are used to provide basic local exchange service and long-distance services and that are subject to chapter 23.34.  Neither the License Agreement nor chapter 23.64 prohibit Level 3 from providing basic local exchange service and long-distance services, or any other services.  Level 3 can choose to offer these services at any time, in which case it will be subject to chapter 23.34.  Accordingly, this Court concludes the license agreement requirement does not violate the Act.

**License Application Process**

Level 3 also challenges § 23.64.050 (B).  It provides: [i]f the information in an application is incomplete or if the proposed use is inconsistent with the requirements of this chapter, the application may be returned as unacceptable for filing."  Level 3 complains that the ordinance  does not spell out what constitutes "inconsistent with the requirements," leaving the City with unacceptable discretion to bar telecommunications services and providers using the rights of way.      This Court disagrees.  The section provides that a license application can be returned if it  is incomplete or if the proposed use is inconsistent with the requirements of chapter 23.64, for example, the application proposes to offer cable services.  The language of the provision does not give the City unfettered discretion to limit the types of services an applicant can provide.  The provision is also unlike the Maryland Heights application process which required information about the types of services to be provided, the applicants legal, technical and financial qualifications, its performance record, as well as detailed mapping information to be provided in a form directed by the city engineer.  Cf. XO Missouri, 256 F.Supp.2d 987, 990, 992, 996-97.  Accordingly, the Court concludes this provision is valid under the FTA.

**License Revocation Provisions**

Level 3 also challenges chapter 23.64.080.  Under chapter 23.64.080 "the City may revoke a license and cancel the underlying license agreement if the licensee violates the terms of that agreement or this chapter." See, 23.64.080 (C ).  As the ordinance further provides, the City must give notice of a default and a 30-day opportunity to cure, as well as the right to a hearing before the Board of Public Service in which the City has the burden of proof.   Moreover, chapter 23.64.080 (C) authorizes the City to seize a licensee's facilities if a licensee chooses to abandon them.  23.64.100 (C).

Level 3 complains that neither the license agreement nor the ordinance attempts to distinguish between material and non-material breaches so that "it seems that the City reserves to itself the power to terminate Level 3's License Agreement for any conduct it perceives as a breach." Level 3 maintains that "having terminated or revoked the License Agreement, the City claims the right to ultimately seize Level 3's network for itself." Level 3 argues this provision is comparable to that struck down in <u>XO Missouri</u>.

The Court disagrees. In <u>XO Missouri</u>, Judge Jackson struck down a provision that permitted removal of all of a provider's facilities for any "material violation" of the Ordinance. She found that such an overbroad and unfettered penalty was not reasonably related to the City's management of its rights-of-way, particularly when there was no guidance as to what "material violation" could result in the removal of a provider's facilities. <u>XO Missouri</u>, 256 F.Supp.2d at 997.

Unlike the Maryland Heights provision, the Court finds that the ordinance does not give the City overbroad and unfettered discretion to terminate the license in light of its due process protections. The notice and opportunity to cure provisions ensure a licensee due process. The process protects both the City and licensee by ensuring a fair and orderly process. The revocation provision also provides a management tool that enables the City to enforce the terms of a license. Therefore the Court concludes it is valid under § 253 (c) of the FTA.

**Installation of Conduit**

Level 3 next challenges Chapter 23.64.080 (G). It provides in relevant part:

The license agreement shall specify that the Licensee shall provide and install in a common trench with the conduit of the Licensee a municipal service conduit(s) if requested and specified by the Board of Public Service.

....

> The Agency shall reduce subsequent license charges due under the license by an amount equal to the additional charge of the Licensee of the conduit, pull boxes, vaults, other materials and additional construction work, other than the cost of the trenching itself, incurred as a result of construction of the municipal service conduit. see, 23.64.80 (G);

Level 3 argues the license agreement and ordinance allow the City to demand that Level 3 install and maintain conduit for the use and benefit of the City whenever Level 3 is doing construction related to its own network. It further argues that this type of in-kind construction is almost always more costly to it because the additional conduit usually requires different construction methods or procedures, adding to Level 3's costs. Level 3 further argues that to the extent the City invoked this provision with some telecommunications providers but not with others, its conduct would be discriminatory and not competitively neutral. It finally argues R.S. Mo. § 67.1842, which provides that "[i]n managing the public right-of-way and in imposing fees pursuant to sections 67.1830 to 67.1846, no political subdivision shall Create or erect any unreasonable requirement for entry to the public right-of-way by public utility right-of-way users, " prohibits cities from requiring any in-kind fees.

The Court does not construe the provision to require in-kind services to the City as Level 3 suggests. Instead, the City may only require Level 3 to install City conduit when Level 3 is already constructing in the public rights-of-way. Further, the ordinance provides that in the event the City would exercise this option, it would reimburse Level 3 for the full costs of the municipal conduit, in the form of a fee credit, including materials, labor, and additional construction expenses. The only cost that is not compensable is the cost of construction of the trench, which Level 3 would have to pay for in any event to install its own conduit. The Court therefore finds this provision to be valid under the FTA.

Level 3 further contends the fees are discriminatory and not competitively neutral. Level 3 complains that it pays per-foot fees to the City under the Ordinance, but at least three of its competitors, including Southwestern Bell Telephone ("SWBT"), McLeod USA, and XO (Nextlink), occupy the rights-of-way in St. Louis without paying fees under the ordinance. These three companies are permitted access to the rights of way without executing a license agreement similar to Level 3's, and instead operate under a different chapter which allows each company to pay a 10% gross-receipts tax rather than a per-foot-fee. Level 3 states that the fact that SWBT enjoys state-mandated freedom from the obligation to pay fees for access to the rights-of-ways of the City (or any other municipality) while Level 3 is required to pay fees for the same privilege, is neither competitively neutral nor nondiscriminatory.

Level 3's argument is unfounded. Every entity that operates in the City's public rights of way require some form of franchise or license. Chapter 23.64, through its licensing provisions, does not prohibit Level 3 from providing service; it enables Level 3 to provide service using public property.

As to differences between chapters 23.34 and 23.64, the City applies chapter 23.34 to any company that provides services functionally equivalent to the services provided by SWBT, i.e., basic local exchange and long distance services. Companies without state franchises, McLeod USA and XO, for example, obtain local authorization to use the public rights of way by agreeing to be bound by chapter 23.34 which imposes a 10% gross receipts tax.

This Court concludes that the distinctions between chapters 23.34 and 23.64 are justifiable and that the City's treatment of those who claim state franchises and those that require local authorization is rational. Moreover, Level 3 has not presented any evidence to suggest that the differences between

the two chapters prohibit or may have the effect of prohibiting Level 3 from providing any service.

**Bond and Insurance Requirements**

Level 3 next complains the Ordinance imposes duplicative and inconsistent bond and insurance requirements on telecommunications companies. Level 3 maintains the ordinance requires it to obtain bonds and insurance, in addition to what the company or its contractors already must obtain pursuant to the street permitting process, citing § §§23.64.120, St. Louis Rev. Code § 20.030, License Agreement at § 8 (B). Level 3 argues the duplicative bond requirement only affects telecommunications companies such as Level 3 because non-telecommunications rights of way users are not subject to the ordinance or license agreements. It argues that insofar as the duplicative bond requirements create conditions that attach only to telecommunications providers, and the effect of noncompliance can be exclusion or expulsion from the market, those duplicative requirements are not permissible under the FTA. Level 3 next claims other providers licensed by the Communications Division have lower bond and insurance requirements in their license agreements and therefore, the lower requirements are not competitively neutral.

The City counters that Level 3's annual premium for its bond is only $600. As to Level 3's insurance requirements, the City notes that Level 3 has admitted it has one policy for numerous jurisdictions and that Level 3 pays no incremental cost for its umbrella insurance policy.

The Court concludes the bond and insurance requirements are standard tools for management of the City's public rights-of-way, and are therefore valid under the FTA.

**Indemnification Requirements**

Level 3 next complains about the "open-ended" nature of the License Agreement provision requiring Level 3 to indemnify the City against all damages connected with Level 3's network. § 8(C). Level 3 argues that many of its competitors were not required to provide the same broad indemnification in their own license agreements. The City counters that the indemnification language in all post-1996 license agreements is the same as that in the Level 3 License Agreement. The Court notes Senator Feinstein cited indemnification provisions as one of the examples of the types of restrictions that Congress intended to permit under § 253(c). The Court concludes this provision is related to the City's management of its public rights-of-way and is therefore protected by § 253 (c), the safe harbor provision.

**Obtaining City Consent Prior to Transfer**

Level 3 next challenges Chapter 23.64.170 (A). It states that a license shall not be transferred without the prior written authorization of the Board of Public Service. Level 3 maintains the Ordinance and License Agreement purport to give the City the power to approve or deny a transfer of ownership of Level 3's network facilities. The City argues that the purpose of the requirement is simply to know who is in control and to ensure that the entity operating a system in the public rights-of-way accepts responsibility.

This Court agrees with the City that purpose of the requirement is to know who is in control and to ensure that the entity operating a system in the public rights-of-way accepts responsibility. The provision directly relates to the management of the public rights-of-way. The cases cited by Level 3 are distinguishable. For example, in <u>City of Auburn v. Qwest</u>, 260 F.3d 11160, 1178 (9th Cir. 2001), the Ninth Circuit held ordinances to be invalid which regulated ownership of telecommunications companies regardless of whether ownership affected the rights of way. The court found the municipal

regulation of stock transfers extended far beyond management of the rights of way and was more than

necessary to manage the rights of way. Likewise, in <u>TCG New York, Inc. v. City of White Plains</u>, 305

F.3d 67, 82 (2d Cir. 2002) the Second Circuit held invalid a provision of "sweeping breadth" whose

main purpose was to force each new telecommunications provider to receive the city's blessing before

offering services, even if its services represent no change from the services offered and burdens

imposed by a prior franchisee. Here the City's provision does not have the same "sweeping breadth"

as in <u>TCG New York</u>, and is therefore valid.

**Reporting Requirements**

Level 3 also challenges the Ordinance's reporting requirements. Chapter 23.64.050(A) (4)

requires upon application for a license the inclusion of an "engineering site plan showing the proposed

location of the communications transmission system, including any manholes or overhead poles, the

size, type and proposed depth of any conduit or other enclosures, and the relationship of the system

to all existing streets, sidewalks, poles, utilities, and other improvements within the public streets."

Chapter 23.150 (I) further requires a licensee keep accurate, complete and current maps and records

of its system and facilities which occupy the streets, public ways and public places within the City and

shall furnish as soon as they are available three (3) complete copies of such maps and records to the

agency.

The Court first notes that Level 3 misreads the plain language of the ordinance; it does not

require a licensee to keep data other than in its own business format. The Court holds these

requirements are directly related to the City's management of its public rights-of-way and therefore

valid under the FTA. <u>Cf.</u> <u>XO Missouri</u>, 256 F.Supp.2d at 983 (declaring ordinance invalid which

required provider to furnish maps to the City in the form directed by the City Engineer, rather than in the form maintained by the user).

### City Licensed Contractor

Level 3 challenges chapter 23.64.140 (D). It requires a licensee to use only contractors who have been licensed by the City in constructing, installing, or maintaining private network facilities installed under the license. The Court concludes this provision is reasonable public safety requirement which protects the City and other users of the public rights-of-way from dangers arising from construction or installation work undertaken by unqualified contractors. It is therefore valid under § 253 (c) of the Act.

### Minimum Technical Specifications 23.64.140

Level 3 also challenges the minimum technical specifications set forth in chapter 23.64.140 (A). The city permits variations to the technical requirements as the ordinance allows. See 23.64.140 (B). This provision enables communities to coordinate the placement of facilities in the public rights-of-way and protect against any unique conditions that might be present in a particular community. It is therefore protected by the safe harbor provision, § 253 (c).

### State law claims

In counts VI and VII of its amended complaint Level 3 also argues that the fees imposed by the ordinance violate SB 369, codified at R.S. Mo. §§ 67.1830 - 67.1846. The statute expressly limits the amounts the City may collect from telecommunications companies who are using the public rights-of-ways to "actual, substantiated costs." R.S. Mo. § 67.1840.2(1). Level 3 argues that since the City's fees are not linked to any of its costs, and there are no circumstances under which the City can meet its burden to substantiate that fact, the fees must be declared illegal under state law.

The City argues it is exempt from SB 369 by the statute's grandfathering clause. Missouri Revised Statute § 67.1846.1 states that a public utility right of way user is not relieved of its obligations under an "existing franchise, franchise fees, license or other agreements or permit in effect on May 1, 2001." Moreover, § 67.1846.1 permits "grandfathered political subdivisions" to enforce existing linear foot ordinances. The City argues it is a grandfathered political subdivision because it enacted Ch. 23.64--which imposes the linear foot fee--prior to May 21, 2001. Level 3 contends the grandfathering clause does not apply, arguing that it was compelled to enter into the License Agreement by virtue of Chapter 23.64, which itself violates the state statute.

The Court agrees that under Level 3's reasoning, the grandfathering clause would be rendered virtually meaningless. The Court therefore concludes the City is exempt from SB 369 by virtue of § 67.1846.1. Therefore the Court concludes City's fees are not invalid under state law.

**42 U.S.C. § 1983 claim**

In count VII of its amended complaint, Level 3 also asserts a claim pursuant to 42 U.S.C. § 1983. Level 3 argues it is entitled to a refutable presumption of damages under § 1983 because (1) it is an intended beneficiary under the Act whose protected rights are not so vague and ambiguous that their enforcement would strain judicial competence; and (2) the Act unambiguously imposed a binding obligation on the states, and by extension the City.

"Section 1983 does not provide an avenue for relief every time a state actor violates a federal law." City of Rancho Palos Verdes, Calif. v. Abrams, 125 S. Ct. 1453, 1458 (2005); Forest Park II, a Minn. Ltd.Partnership v. Hadley, 408 F.3d 1052 (8th Cir. 2005).

"Violation of a federal statute does not automatically give rise to a civil rights claim under § 1983. This is because "[i]n order to seek redress through § 1983, . . . a plaintiff must assert the

violation of a federal *right*, not merely a violation of federal *law*." Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) ("[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983].") (emphasis in original). Section 1983 provides a method of redress only for those federal statutes which "create enforceable rights, privileges, or immunities within the meaning of § 1983." Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423 (1987). "Accordingly, to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." Id. The plaintiff bears the burden to demonstrate that the statute at issue confers a federal right on the plaintiff. Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 523 (8th Cir. 1993). The Supreme Court recently clarified that nothing short of an "unambiguously conferred right" will support a cause of action brought under § 1983. Gonzaga Univ., 536 U.S. at 283.

The touchstone for determining whether a statute confers a private right of action is congressional intent. Thompson v. Thompson, 484 U.S. 174, 179 (1988). "'[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" Id. (quoting Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94 (1981)); see also Gonzaga Univ., 536 U.S. at 286 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.").

Although the Eighth Circuit has not addressed this issue, the Tenth Circuit did so in Qwest v. City of Santa Fe 380 F.3d 1258, 1265-67 (10th Cir. 2004), affirming the district court that no action

under § 1983 was available because nothing in the text or structure of § 253 indicated an intention to create a private right. Cf. City of Rancho Palos Verdes v. Abrams, --- U.S. ----, 125 S.Ct. 1453, 1454 (2005) (holding enforcement of the TCA's substantive provisions "through § 1983 would distort the scheme of expedited judicial review and limited remedies created by" the TCA's remedial provisions; after identifying the express private remedy in the TCA, § 332(c)(7), the Court concluded that Congress did not intend this remedy to coexist with an alternative remedy available in a § 1983 action). The Court concludes Level 3 has not met its burden to demonstrate that the Act confers a federal right on it, see Arkansas Med. Soc'y, 6 F.3d at 523, and therefore holds that no cause of action under § 1983 is available. Accordingly, the Court will deny Level 3's motions for summary judgment on its § 1983 claim.

**Severability**

The Court now addresses whether the entire ordinance must be declared invalid. Severability is a matter of state law. Leavitt v. Jane L., 518 U.S. 137, 139 (1996). Missouri courts have traditionally used section 1.140 R.S.MO. as the test for severability of an unconstitutional county ordinance provision. See Avanti Petroleum, Inc. v. St. Louis County, 974 S.W.2d 506, 512 (Mo.Ct.App.1998). The test, as enumerated in Avanti Petroleum, is:

> The ordinance is valid, regardless of invalid provisions, unless the Court finds the valid provisions of the [ordinance] are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed [the City] would have enacted the valid provisions without the void one; or unless the Court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Id. Applying the above standard to the instant case, the Court determines that severability is appropriate. The Ordinance contains several express purposes, including obtaining compensation for

use of public rights-of-way, providing the City with underground conduit for municipal use, and properly managing what occurs within those public rights of-way. While this Order invalidates the fee provisions of chapter 23.64, other legislative purposes expressed by the City, including management of the public rights-of-way, can still be accomplished. Accordingly, the remaining provisions of chapter 23.64 will be upheld.

Finally, Level 3 moves to strike the city's reply to plaintiff's response to the City's Statement of facts. Under Federal Rule of Civil Procedure 12(f), a court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are not favored and are infrequently granted, because they propose a drastic remedy. Stanbury Law Firm v. Internal Revenue Service, 221 F.3d 1059, 1063 (8th Cir. 2000). Matter will not be stricken unless it clearly can have no possible bearing on the subject matter of the litigation. 2 James W. Moore, et al., Moore's Federal Practice §12.37[3] (3rd ed. 2003). If there is any doubt whether the matter may raise an issue, the motion should be denied. Id. If allegations are redundant or immaterial, they should be stricken only if prejudicial to the moving party. Id.

Nonetheless, resolution of such a motion lies within the broad discretion of the Court. Stanbury, 221 F.3d at 1063. The Court in its discretion will deny the motion.

## III. CONCLUSION

For all of the above reasons, the Court will grant in part and deny in part Level 3's motion for summary judgment. The Court will grant in part and deny in part the City's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that the City of St. Louis's motion for summary judgment is

**GRANTED** in part and **DENIED** in part.  (Doc. 53)

**IT IS FURTHER ORDERED** that Level 3's motion for summary judgment is **GRANTED** in part and **DENIED** in part.  (Doc. 55.)

**IT IS FURTHER ORDERED** that the City of St. Louis's motion to amend/correct is **GRANTED.**  (Doc. 66).

**IT IS FURTHER ORDERED** that Level 3's motion to strike the City's reply to responses to its statement of facts is **DENIED.**  (Doc. 70)


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this 19th day of December, 2005.